Thomas A. Kane and Anne C. Kane v. Commissioner.
Kane v. Commissioner
Docket No. 7678.
United States Tax Court
1947 Tax Ct. Memo LEXIS 286; 6 T.C.M. (CCH) 222; T.C.M. (RIA) 47053; February 28, 1947
Louis Auerbacher, Jr., Esq., and David Zuckerman, C.P.A., 60 Park Pl., Newark 2, N.J., for the petitioners. Sheldon V. Ekman, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL Judge: Respondent determined a deficiency in petitioners' income tax liability for 1941 in the amount of $6,260.32. Respondent also determined a deficiency for the year 1939 but on motion by respondent the proceeding was dismissed in so far as it related to the year 1939 for lack of prosecution by petitioners. The questions are, (1) whether certain transactions *287 incident to a settlement of an action instituted by petitioner Thomas A. Kane constituted a sale by him of certain stock involving taxable gain, and (2) whether payment by petitioner Thomas A. Kane of certain legal fees in connection with such settlement constituted a deductible expense under section 23 (a) of the Internal Revenue Code. Petitioners filed a joint return for 1941 with the collector of internal revenue for the second district of New York. The case was submitted on oral testimony and exhibits. Findings of Fact Petitioners are husband and wife residing in New York City. The term "petitioner" will be used hereinafter to refer to petitioner Thomas A. Kane. About 1930 petitioner became identified with Colonel Marcellus Thompson, now deceased, hereinafter referred to as Thompson. Thompson and others were minority stockholders in the Auto-Ordance Company, hereinafter referred to as Auto. Auto had been formed in 1916 to manufacture submachine guns, popularly known as "tommy guns." A majority of Auto's stock was held by the Guaranty Trust Company of New York, hereinafter referred to as Guaranty, as executor of the estate of Thomas Fortune Ryan, who *288 died in 1929. Up until 1939 petitioner as attorney for Thompson and Thompson had unsuccessfully endeavored to gain greater control over Auto on behalf of the minority stockholders. In February 1939 petitioner and Thompson formed a New York corporation under the name of Thompson Automatic Arms Company, hereinafter referred to as TAAC. TAAC was formed for the purpose of acquiring control over Auto. TAAC, at the time of its formation, had an authorized capital stock of 800,000 shares, of which petitioner was issued 16,500 shares having a value at that time of $1.24 a share. Petitioner and Thompson, on behalf of TAAC, entered into an agreement with Guaranty. By this agreement TAAC undertook to purchase from Guaranty all the Auto stock held by Guaranty as [*] of the Ryan estate, which amounted to about 18,500 shares. The purchase price was fixed at $529,000, payable $264,500 on July 21, 1939, and a like amount on September 21, 1939. The minority stockholders of Auto were required by Guaranty to pledge their stock with Guaranty as liquidated damages in the event TAAC was unable to pay the purchase price as agreed. TAAC entered into arrangements with Russell Maguire for the purpose *289 of raising the necessary money to purchase the Auto stock from Guaranty. Maguire succeeded in this connection in obtaining the acceptance of a loan from the Marine Midland Bank & Trust Company for $539,000. It was then contemplated that TAAC would pay Guaranty the entire purchase price of $529,000 on July 21, 1939, instead of in two payments. Prior to July 21, 1939, Maguire demanded 116,400 shares of TAAC stock. In compliance with this demand the stockholders of TAAC held a meeting on July 20, 1939, at which they voted Maguire 116,400 shares. At the same meeting the stockholders voted 1,800 shares each to petitioner and Thompson for their efforts in connection with the negotiations with Guaranty. At 10 o'clock in the morning of July 21, 1939, the day for closing with Guaranty, petitioner and Thompson met pursuant to arrangements at the office of Mortimer S. Gordon, who was one of Maguire's attorneys. The purpose of this meeting was to complete the loan arrangement with Maguire and obtain the necessary funds to enable petitioner and Thompson on behalf of TAAC to meet the purchase price deadline set by Guaranty. Shortly after the meeting commenced Thompson was stricken ill and was *290 taken to the hospital. Petitioner was therefore left alone to complete the transaction on behalf of TAAC. At about 2:30 p.m., Maguire, by a representative named Matthew J. Hall, announced to petitioner that he, Maguire, would not make the funds available unless petitioner and Thompson transferred to Maguire 7,500 shares of TAAC stock from their personal holdings. Petitioner initially refused to do this. Petitioner was urged to persuade Thompson at the hospital to comply with Maguire's demand. Petitioner again refused. At 4 o'clock in the afternoon petitioner was contacted by Eugene D. Powers, another of Maguire's attorneys, and was informed that Thompson had agreed to transfer to Maguire 3,100 shares of TAAC stock and had further actually transferred to Maguire the 1,800 shares which he, Thompson, had been voted the previous day. This left 2,600 shares of Maguire's demand for 7,500 shares unsatisfied, and petitioner was requested to transfer to Maguire 2,600 shares. From 4 until 11 o'clock, petitioner was kept under pressure by Maguire's emissaries to transfer to Maguire 2,600 shares of TAAC stock. At 11 o'clock at night Maguire personally contacted petitioner and threatened to kill *291 the loan arrangement altogether unless petitioner agreed to transfer to him 2,600 shares. Maguire further stated that he himself would purchase the Auto stock from Guaranty if TAAC did not. Petitioner realized that at midnight the purchase price deadline set by Guaranty would have passed and that failure to meet it meant the loss to him, Thompson and the other minority stockholders of Auto of their stock in Auto which had been pledged as liquidated damages. At 11:15 petitioner gave in to Maguire's demand. Petitioner transferred to Maguire the 1,800 shares of TAAC which petitioner had been voted the previous day and further agreed to transfer to Maguire 800 additional shares. At 11:45 p.m., the entire transaction was consummated and TAAC became the owner of all of Auto's stock. TAAC was then controlled by Maguire. On July 22, 1939, Maguire caused a meeting of the board of directors of TAAC to be held at which the resignations of Thompson, as president, and petitioner, as vice-president of TAAC, were accepted. The resignations had been demanded by Maguire the previous day. Subsequent to July 21, 1939, petitioner demanded from Maguire a return of the stock petitioner had transferred *292 to him on that date on the theory that such stock had been obtained by duress. Arthur T. O'Leary was hired by petitioner as attorney and four actions against Maguire were instituted in the New York courts. The nature of these four actions was as follows: (1) suit on behalf of the estate of Thompson, who had died on October 17, 1939. Petitioner and Thompson's widow were coexecutors of the estate. This action was to recover for the estate the 3,100 shares of TAAC stock which Thompson had transferred to Maguire on July 21, 1939. (2) Suit on behalf of the Thompson estate for the amount of $7,500 allegedly due Thompson as compensation from TAAC. (3) Suit on behalf of the stockholders of TAAC to recover the 116,400 shares voted to Maguire on July 20, 1939. (4) Suit by petitioner to recover the 2,600 shares of TAAC stock transferred by petitioner as a result of the events of July 21, 1939. After certain preliminary discussions these four suits were settled on February 28, 1941. This final settlement was accomplished at a meeting held in the law offices of Wolf & Schwabacher, who represented Maguire. Present at the settlement meeting were Maguire and his attorneys, Schwabacher and Powers; *293 petitioner and his attorney O'Leary; and Kessler, who represented the Thompson interests. The suit on behalf of the Thompson estate to recover 3,100 shares of TAAC stock was settled for $18,000, which was paid by check by Maguire. Of this amount $3,000 represented attorney's fees. The suit on behalf of the Thompson estate for $7,500 in salary was settled for $5,000 which was paid by Maguire by check. The stockholders' suit to recover 116,400 shares of TAAC stock was settled by payment to O'Leary of attorney fees. This payment was made by Maguire also by check. O'Leary took possession of the three checks delivered by Maguire in settlement of the three suits just mentioned and kept them in part as security for his fees. Petitioner's suit to recover 2,600 shares of TAAC stock from Maguire was settled in the following manner. Maguire had offered to deliver to petitioner 1,400 shares of TAAC stock in settlement. Petitioner had indicated his willingness to settle on this basis. At the February 28th meeting there were 1,400 shares of TAAC stock on Schwabacher's desk in the form of 14 certificates representing 100 shares each. Powers, one of Maguire's attorneys, put a certified check for *294 $42,000 drawn by Maguire in petitioner's favor on petitioner's desk at the meeting and requested that petitioner endorse it to Edward G. Stocker, who was an officer of Marine Midland Bank & Trust Company. Petitioner objected that he was settling for 1,400 shares of stock and not for cash. Powers assured petitioner that he would get 1,400 shares of stock and explained that the check petitioner was being requested to endorse was merely a bookkeeping arrangement for Maguire's convenience that need not concern petitioner. Petitioner conferred with his associates on the matter. Maguire's representatives insisted on petitioner endoring the check before they would deliver the 1,400 shares of stock to petitioner. Petitioner finally agreed and did endorse the check to Stocker as requested. After petitioner endorsed the check, it was taken from him by Powers and petitioner never saw it again until the hearing in the instant proceeding. Petitioner then received 1,400 shares of TAAC stock. O'Leary took possession of this stock at the meeting and held it along with the checks described above as part security for his fees. Petitioner, after O'Leary's fees were paid, obtained possession of these *295 shares. In 1941 petitioner paid O'Leary $9,333.33 as fees for his legal services in connection with instituting and settling petitioner's suit against Maguire to recover 2,600 shares of TAAC stock. Petitioners, on their return for 1941, did not report any income as arising from the settlement made with Maguire on February 28, 1941. Respondent determined that the settlement transaction constituted a sale by petitioner to Maguire of 2,600 shares of TAAC stock for $42,000 involving a longterm capital gain to petitioner of $19,628.45. In determining the gain respondent has deducted the amount of $9,333.33 representing O'Leary's fee from the sale price received by petitioner from the stock. Petitioner claims the amount of this fee as a deduction under section 23 (a). The settlement arrangement of February 28, 1941, did not involve a sale of stock by petitioner to Maguire. Opinion Respondent considers the settlement arrangement of February 28, 1941, as involving a sale by petitioner to Maguire of 2,600 shares of TAAC stock for which petitioner received as a purchase price Maguire's certified check for $42,000 with which petitioner purchased from Stocker 1,400 shares of TAAC stock. *296 Respondent consequently seeks to tax the gain resulting from such sale. Petitioner considers the settlement agreement as having involved merely a recovery by him of 1,400 shares of TAAC stock in compromise of his claim for 2,600 shares allegedly taken from him by Maguire under duress. We think petitioner's interpretation of the facts is correct and that the settlement arrangement did not involve a sale of stock by petitioner. Respondent spells out a sale by petitioner from the fact that petitioner received a check from Maguire for $42,000 which he endorsed to Stocker. In this connection respondent relies on the fact that the petition filed in the suit instituted by petitioner against Maguire prayed in the alternative for money damages. Such a prayer for money in the alternative to a recovery of stock does not impress us as indicating that the settlement arrangement constituted a sale. Such alternative prayer strikes us as nothing more than prudent pleading. Respondent further relies on a document introduced into evidence and designated as a stipulation of settlement. This document recites and lists the four suits pending against Maguire and then describes a settlement to which the *297 parties agreed. This document is dated February 28, 1941, and is signed by O'Leary, Powers, petitioner, Thompson's widow, and Maguire. This document recites that petitioner's suit against Maguire was settled for $42,000. We have carefully considered this document and have concluded that its recitations and provisions do not alter the facts of settlement as we have found them. It appears to have been a document prepared at Maguire's instigation since neither O'Leary nor petitioner prepared it. As such we think it was drawn to record the check-endorsing manipulation insisted upon by Maguire. In this light the document strikes us as merely another bookkeeping arrangement, a formality for the record, done for the convenience of Maguire and for some undisclosed reason satisfactory to him. The events leading up to the settlement agreement present, in our opinion, a background incompatible with a view that the settlement constituted a sale. Petitioner originally brought suit to recover stock he alleged had been taken from him under duress. The record indicates that stock recovery, not money, was the basis of all settlement negotiations. Petitioner's endorsement of the $42,000 check was *298 under such circumstances as to constitute, in our opinion, a mere technical gesture without substantive significance, done at the behest and for the bookkeeping convenience of Maguire. The record clearly indicates that the check shuffling phase of the settlement was initiated and insisted upon by Maguire, who appears to have dominated the proceeding. Petitioner at the time hesitated to endorse the check and repeated his demand for stock, not money. He finally endorsed the check only after being assured he would get the 1,400 shares of TAAC stock. From petitioner's point of view the check incident was of no significance except that under the pressure of bargaining it appeared to be a necessary gesture to facilitate the conclusion of settlement proceedings and avoid difficulty with Maguire. There appears to us to be lacking the mutual assent generally deemed a necessary factor to constitute a sale. See Williston on Sales, 2d Edition, section 5. Under these circumstances it strikes us as strained, unrealistic and contrary to common sense to interpret the settlement as involving a sale by petitioner. If the check incident be distorted to result in a sale of 2,600 shares by petitioner for *299 $42,000, we then have to believe that petitioner immediately purchased 1,400 shares for the same price from Stocker, which gives the whole transaction an unnatural and bizarre aspect. We conclude that the settlement of February 28, 1941, did not involve a sale by petitioner. It follows and we hold that respondent erred in determining a deficiency in this connection. Petitioners, in their petition, assigned as error respondent's disallowance of the $9,333.33 paid to O'Leary as legal fees in connection with the settlement as ordinary and necessary business expense. On brief petitioners argue that this amount is deductible as a non-business expense. In our opinion the amount paid O'Leary constitutes a capital expense. It was paid in connection with legal efforts to recover ownership of stock allegedly taken under duress. As such, the expense is analogous to legal expense incurred defending or clearing title to property. See Murphy Oil Co. v. Burnet, 55 Fed. (2d) 17, and Helvering v. Stormfeltz, 142 Fed. (2d) 982. We hold that the expense in question is a capital one and not deductible under section 23(a)(1) or (2). Decision will be entered under Rule 50. *300